# In the
# United States Court of Appeals
## For the Seventh Circuit

———————

No. 02-3930

In the Matter of:

TIMOTHY GERARD O'HEARN,

*Debtor*,

TIMOTHY GERARD O'HEARN,

*Plaintiff-Appellee*,

*v.*

EDUCATIONAL CREDIT MANAGEMENT
CORPORATION,

*Defendant-Appellant*.

———————

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 01 C 1299—**Charles N. Clevert, Jr.**, *Judge*.

———————

ARGUED APRIL 22, 2003—DECIDED AUGUST 8, 2003

———————

Before COFFEY, RIPPLE and EVANS, *Circuit Judges*.

RIPPLE, *Circuit Judge*. Timothy O'Hearn filed for Chapter 7 bankruptcy relief and sought to discharge his government-guaranteed educational loans owed to the defendant, Educational Credit Management Corporation ("ECMC"), a not-for-profit organization that administers guaranteed student loans. After a hearing, the bankruptcy court con-

cluded that the student loans would impose an "undue hardship" on Mr. O'Hearn. *See* 11 U.S.C. § 523(a)(8). The court therefore entered an order discharging the loans. The bankruptcy court further ordered that any funds Mr. O'Hearn might collect from an earlier judgment against the person who fraudulently had diverted Mr. O'Hearn's payments to his own use be remitted to ECMC in order to satisfy the amount of the student loans plus interest. ECMC appealed the bankruptcy court's decision to the district court. That court affirmed the decision of the bankruptcy court. For the reasons set forth in the following opinion, we vacate the judgment of the district court and remand the case for proceedings consistent with this opinion.

# I

# BACKGROUND

## A. Facts

Mr. O'Hearn had attended Loma Linda University in California in 1993 and 1994 to obtain a master's degree in international public health. He financed this education through student loans totaling approximately $37,000. After graduation, Mr. O'Hearn worked at various jobs in Washington, D.C., and Uganda and Malawi in Africa. Bankr. Hr'g Tr. at 4. During his two-year service in Malawi, he sent $55,000, which was the bulk of his income, to his accountant in the United States. He had given directions that the funds be used to pay his student loans and other bills. *Id.* at 22-23. Mr. O'Hearn presented evidence that these funds should have been enough to pay his student loans in full, and that, had his accountant done so, the loans would have been repaid upon his return from Africa. *Id.*

Upon his return home to Wisconsin in April 1999, Mr. O'Hearn learned that his accountant had paid only $6,200 on the student loans and had absconded with the rest of his income and most of his retirement investment. *Id.* at 6, 23-24; R.3. Mr. O'Hearn sued his former accountant and received a judgment for $79,000 plus punitive damages but, at the time of the bankruptcy court hearing, he had only been able to collect about $5,700. Appellee's Summ. J. Mot. at 3.

Mr. O'Hearn was 50 years old at the time of trial. He had no children or dependents. After filing for Chapter 7 bankruptcy in January 2000 while living in Wisconsin, Mr. O'Hearn relocated to Portland, Oregon, in order to take a job as a diabetes coordinator for the Northwest Indian Health Board. Bankr. Hr'g Ex.2; Bankr. Hr'g Tr. at 10. His salary was $43,000 per year, plus medical and dental benefits. Bankr. Hr'g Tr. at 11, 38. There was some evidence that his salary might increase eventually to $50,000 per year, and that he was eligible for future retirement contributions from his employer. *Id.* at 19-20, 46. The bankruptcy court found that Mr. O'Hearn had obtained the best-paying job he could, given his age, training and interests. *Id.* at 99-100. Mr. O'Hearn testified that, before taking this position, he had applied to over 500 public and private employers in such fields as public health, teaching, administration and insurance. *Id.* at 62-64. The court also noted that, given his age, Mr. O'Hearn might have a "tough time" finding work in the future. *Id.* at 99. Mr. O'Hearn had no retirement investment left at the time of trial; it either had been stolen by his former accountant or had been used to pay for living expenses. *Id.* at 13-15. He testified that he did not have any health problems that impaired his ability to work. *Id.* at 69-70.

In Portland, Mr. O'Hearn lived and shared expenses with his fiancée, although he testified that their relationship was "strained" at that time. *Id.* at 54-57. The court calculated his net monthly income as $2,376 and his monthly expenses, excluding student loan payments, as approximately $2,500. *Id.* at 96. Mr. O'Hearn testified that, as part of his monthly expenses, he paid $1,402, or half of the mortgage payment, for his fiancée's house. *Id.* at 27-28, 97. His fiancée had purchased the 2000-square-foot, four-bedroom house for around $380,000. *Id.* at 43-44. Mr. O'Hearn claims no equity interest in this property. *Id.* at 29. He presented evidence that the average purchase price of a 2000-square-foot house in Portland in 1998 was $260,000. *Id.* at 44-45. The court found that he could rent a two-bedroom apartment in Portland for less than $1,000 per month, but also concluded that his other expenses, no longer being shared, would probably double. Bankr. Hr'g Ex.6; Bankr. Hr'g Tr. at 97-98.

The bankruptcy court detailed Mr. O'Hearn's other monthly expenses as: $115 for a car purchased from his fiancée, $100 for car insurance, $210 for food, $160 for phone and utilities, $80 for clothing and $100 for incidentals. Bankr. Hr'g Ex.1; Bankr. Hr'g Tr. at 32-34, 98-99. Mr. O'Hearn also reported legal expenses of $200 per month, and the court believed that he probably would face additional medical expenses because he had contracted malaria in Africa and had eye and dental problems. Bankr. Hr'g Tr. at 38, 99. ECMC presented the current IRS housing and utility allowance for a family of two or less in Portland as $837 per month. Bankr. Hr'g Ex.5; Bankr. Hr'g Tr. at 79.

As for the student loans, Mr. O'Hearn had defaulted on them in early 1999 and, at the time of the hearing, owed ECMC just over $50,000 in principal and interest. Bankr. Hr'g Tr. at 88; Appellee Summ. J. Mot. at Ex.A. The court calculated that his monthly payments would be around

$375. Bankr. Hr'g Tr. at 100. Before filing for bankruptcy, Mr. O'Hearn had offered a lump sum payment of $30,000, comprised of remaining savings and contributions from family, but the collection agency handling the loans rejected this proposed settlement, and Mr. O'Hearn made no further payments. *Id.* at 15-16; Appellee's Summ. J. Mot. at Ex.D.

## B. Earlier Proceedings

The bankruptcy court concluded that Mr. O'Hearn had met the "undue hardship" test of 11 U.S.C. § 523(a)(8). It took the view that Mr. O'Hearn had satisfied the three-part test for "undue hardship" previously established by this court:

> (1) the debtor cannot maintain, based on current income and expenses, a minimal standard of living for himself and his dependents if forced to repay the loans; *and*

> (2) additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of the student loans; *and*

> (3) the debtor has made good-faith efforts to repay the loans.

*See In re Roberson*, 999 F.2d 1132, 1135 (7th Cir. 1993).

The bankruptcy court concluded that Mr. O'Hearn could not cover his current expenses despite what the court characterized as a "frugal" budget. The court also believed that, given his age, Mr. O'Hearn's financial difficulties would persist. With respect to his employment opportunities, the court believed that, considering his age and his particular training and talents, he had maximized his job opportunities. With respect to his living arrangement, the

court believed that he could not reduce his overall expenses by renting less expensive quarters because he would not have the advantage of sharing other living expenses. The court also noted that he had made good-faith efforts to pay the loans.

Accordingly, the court discharged Mr. O'Hearn's student loans. The court further ordered that any funds recovered on the judgment against his former accountant be remitted to ECMC. It decided to impose this arrangement despite ECMC's objection that such a plan would have the practical effect of relieving Mr. O'Hearn of any incentive to collect the judgment. On appeal, the district court affirmed the discharge. ECMC timely appealed to this court.

## II

## DISCUSSION

### A.

The basic purpose of a discharge in bankruptcy is to give debtors a fresh start. *See Vill. of San Jose v. McWilliams*, 284 F.3d 785, 790 (7th Cir. 2002). Congress nevertheless has decided that various considerations of public policy require that certain debts be excluded from the general principle of discharge. Student loan debts are among those debts that Congress has singled out for such exclusion. This student loan exception is codified in the Bankruptcy Code at 11 U.S.C. § 523:

> A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt . . . for an educational benefit overpayment or loan made, insured or guaranteed by

> a governmental unit, or made under any program funded in whole or in part by a governmental unit or nonprofit institution, or for an obligation to repay funds received as an educational benefit, scholarship or stipend, unless excepting such debt from discharge under this paragraph will impose an undue hardship on the debtor and the debtor's dependents.

11 U.S.C. § 523(a)(8). Under this provision, debtors cannot discharge student loans in bankruptcy unless they show that paying on the loans would cause "undue hardship." Supporters of this limitation on the dischargeability of these loans sought to curb abuse by unscrupulous former students who, having obtained their education, sought to evade their commitment to pay for it by seeking immediate discharge of their loans.[1]

The key phrase of the statutory provision, "undue hardship," is not defined in the statute. Nor does the legislative history provide meaningful guidance. As noted earlier, in *Roberson*, 999 F.2d at 1135, we adopted the three-part test for "undue hardship," first enunciated by the Second Circuit in *Brunner v. New York State Higher Educucation Services Corp. (In re Brunner)*, 831 F.2d 395 (2d Cir. 1987) (per curiam). In adopting that approach, we chose a path that gave ample recognition to the term "undue" in order to ensure that the intent of Congress would be fully reflected in our adjudications. As our colleagues in the Ninth Circuit have noted,

---

[1] *See Ekenasi v. Educ. Res. Inst. (In re Ekenasi)*, 325 F.3d 541, 545-46 (4th Cir. 2003); *Long v. Educ. Credit Mgmt. Corp. (In re Long)*, 322 F.3d 549, 554 (8th Cir. 2003); *United Student Aid Funds, Inc. v. Pena (In re Pena)*, 155 F.3d 1108, 1111 (9th Cir. 1998); *Tennessee Student Assistance Corp. v. Hornsby (In re Hornsby)*, 144 F.3d 433, 436-37 (6th Cir. 1998).

Congress would not have made student loans an exception to discharge if it meant to allow discharge based on merely "garden-variety" hardship. *See Rifino v. United States (In re Rifino)*, 245 F.3d 1083, 1087 (9th Cir. 2001); *see also Pennsylvania Higher Educ. Assistance Agency v. Faish (In re Faish)*, 72 F.3d 298, 305-06 (3d Cir. 1995) ("[T]he *Brunner* standard safeguards the financial integrity of the student loan program by not permitting debtors who have obtained the substantial benefits of an education funded by taxpayer dollars to dismiss their obligation merely because repayment of the borrowed funds would require some major personal and financial sacrifices."); *Roberson*, 999 F.2d at 1135 (deeming § 523(a)(8) as "heightened standard for dischargeability of student loans").

Each prong of this "undue hardship" inquiry reflects the need to keep in mind this basic policy decision by Congress. Accordingly, the first prong examines "the debtor's current financial condition to see if payment of the loans would cause his standard of living to fall below that minimally necessary." *Id.* Similarly, the second prong, future prospects, "should be based upon the certainty of hopelessness, not simply a present inability to fulfill financial commitment." *Id.* at 1136 (citation omitted). The third prong, good faith, is measured by the debtor's "efforts to obtain employment, maximize income, and minimize expenses . . . [and] encompasses a notion that the debtor may not willfully or negligently cause his own default, but rather his condition must result from 'factors beyond his reasonable control.'" *Id.* (citation omitted).

**B.**

As we have stated in prior decisions, we review de novo whether the debtor's circumstances meet the "undue

hardship" test. *Goulet v. Educ. Credit Mgmt. Corp.* (*In re Goulet*), 284 F.3d 773, 777 (7th Cir. 2002); *Roberson*, 999 F.2d at 1137. In doing so, however, we must give deference to the bankruptcy court's findings of adjudicative fact and to the factual inferences that the court drew from those facts as long as those findings are ground in the evidence of record. *See, e.g., Pena*, 155 F.3d at 1114 ("[T]he bankruptcy court did not clearly err in finding that the [debtors] exhibited good faith in attempting to pay back the student loans."); *Roberson*, 999 F.2d at 1137 (accepting the bankruptcy court's factual finding that the debtor's "financial straits were not likely to continue for an extended period of time"). The debtor has the burden of establishing each element of the three-part "undue hardship" test by a preponderance of the evidence, and if he fails on any one element, "the test has not been met and the court need not continue with the inquiry." *Goulet*, 284 F.3d at 777.

## C.

Although we normally give deference to a bankruptcy court's factual findings and inferences, we must conclude that, in this case, we cannot affirm the discharge of Mr. O'Hearn's student loans because, insofar as we can tell from the record before us, the bankruptcy court grounded its decision on factual inferences that are not supported by the record.[2]

---

[2] *See, e.g., Ekenasi,* 325 F.3d at 548-49 (reversing where evidence was too "speculative" to substantiate bankruptcy court's findings); *Goulet*, 284 F.3d at 79 (concluding that bankruptcy court erred, in part, by drawing inferences that were not supported by the evidence); *Brightful v. Pennsylvania Higher Educ. Assistance*
(continued...)

Of particular concern to us is the bankruptcy court's analysis of Mr. O'Hearn's financial circumstances under the first prong of the established test—his ability to maintain, based on current income and expenses, a minimal standard of living for himself, if he is required to repay the loans. At the time of the hearing, Mr. O'Hearn had no dependents and an annual income of $43,000 plus benefits. Thus, his monthly income exceeded the IRS housing and utility allowance for a *family of two* in Portland by nearly $1,500.[3] The bankruptcy court nevertheless concluded that Mr. O'Hearn could not maintain a minimal standard of living if forced to repay his loans.[4]

The bankruptcy court's analysis of Mr. O'Hearn's expenses raises even more serious questions for us. The court allowed Mr. O'Hearn to justify a rent payment to live in his fiancée's house that was nearly $500 higher than the amount he apparently would have paid for a two-bedroom apartment in the Portland area. The court based this justification on two assumptions: that Mr. O'Hearn would have to live alone if he rented an apartment; and that by living alone many of his expenses, no longer shared, would likely double. We cannot see how this record necessarily supports these conclusions. Many couples are forced to live

---

[2] (...continued)
*Agency (In re Brightful)*, 267 F.3d 324, 330-31 (3d Cir. 2001) (reversing where record did not support bankruptcy court's inferences).

[3] *Cf. Hornsby*, 144 F.3d at 438 (questioning whether debtors could meet first prong when their income put them significantly above poverty guideline).

[4] *Cf. Faish*, 72 F.3d at 306 (concluding that single mother did not meet first prong where she made salary of $27,000 in 1993, faced loan payments of $300, and supported one son).

in less appealing housing because of the financial obliga-
tions undertaken by one or the other. More importantly, it
is speculative to assume that his expenses would necessarily
double if he lived alone in an apartment. There is no
evidence of record that it takes even close to the same
amount of heat or light to service a two-bedroom apartment
as it does to support a 2000-square-foot, four-bedroom
house.[5]

With respect to the second prong, the bankruptcy court's
conclusions with respect to Mr. O'Hearn's future outlook
also are troubling. Here, the inquiry centers on whether
circumstances indicate that Mr. O'Hearn's financial situa-
tion is likely to persist for a significant portion of the
repayment period.[6] The bankruptcy court did not explore

---

[5] The bankruptcy court estimated Mr. O'Hearn's monthly loan
payments at $375, based on figures provided by ECMC's attorney
during closing argument at the hearing. In its brief on appeal,
however, ECMC now suggests that Mr. O'Hearn's payments
might be lower—around $325 per month—if he consolidated his
loans. (ECMC revised this figure to $350 per month in its reply
brief.) It appears, however, from the hearing transcript that
ECMC's attorney already had assumed a low-interest rate of 4
percent in calculating the $375 figure. We do not believe that it is
appropriate for ECMC to amend its estimation on appeal. We
also note that neither party has explored whether Mr. O'Hearn is
eligible for consolidation of these loans.

[6] Although we discern serious gaps in the bankruptcy court's
analysis on the second prong, we do wish to note that the court
properly considered Mr. O'Hearn's age in forecasting his future
prospects. Mr. O'Hearn was 50 years old at the time of the
hearing and the court found that, given his age, he might have a
"tough time" finding other work in the future. The bankruptcy
court was also concerned with Mr. O'Hearn's lack of retirement
(continued...)

fully whether taking jobs in other fields might put Mr. O'Hearn in better financial standing. The bankruptcy court concluded that Mr. O'Hearn had found the best-paying job he could in the public health field and that, given his age, he might have a "tough time" finding other work in the future. And Mr. O'Hearn testified that he contacted over 500 employers in different fields before landing his present job. But, other than testimony that he has worked as a substitute teacher and has some "background in manufacturing," we cannot tell from the record if Mr. O'Hearn has job skills that would be transferable to higher-paying occupations. Instead, the bankruptcy court seemed to focus on his choice to work in the public health field, commenting that "I don't think we can necessarily ask people to [take other jobs] just to pay their student loans." However, it is not uncommon for individuals to take jobs not to their liking in order to pay off their student loans, or for that matter to meet all sorts of other financial obligations. *See Brightful*, 267 F.3d at 329 n.4 (noting debtor's responsibility to pursue other employment avenues if prospects at current job are limited). *But cf. Cheesman v. Tennessee Student Assistance Corp. (In re Cheesman)*, 25 F.3d 356, 360 (6th Cir. 1994) (in affirming stay of discharge decision, accounting for debtors' choice to "work in worthwhile, albeit low-paying, professions").

---

[6]  (...continued)

funds. Although we have discounted such arguments in the past, *see Goulet*, 284 F.3d at 779 ("By returning to graduate school at the age of 45 and voluntarily assuming the debt, [the debtor] must have believed that he had future earnings potential."), the consideration may be more compelling in Mr. O'Hearn's case because there is some evidence that he devised a way to pay the loans in full before even coming close to retirement age, and might have done so were it not for his accountant's embezzlement.

Although Mr. O'Hearn has been fortunate in finding a position that he deems satisfying and that is socially useful, Congress has not provided that such considerations ought to be weighed in determining the discharge of student loans. *See Roberson*, 999 F.2d at 1137 (explaining, in adopting the *Brunner* test, that "[i]f the leveraged investment of an education does not generate the return the borrower anticipated, the student, not the taxpayers, must accept the consequences of the decision to borrow").

With respect to this second prong, another factor remains underdeveloped on this record. Although Mr. O'Hearn has a responsibility to take into account the need to replenish his retirement assets, we are not told with any precision the impact that this consideration might have on his economic future. Mr. O'Hearn is a crime victim. If the record were more fully developed and the findings of the bankruptcy court more extensive, it would be possible to determine the sort of weight that this factor ought to be given in analyzing Mr. O'Hearn's prospects.

Given the evidence in the record, we cannot say that the bankruptcy court was on solid ground in its determination that Mr. O'Hearn had met his burden on either the first or the second prong of the established "undue hardship" test.

With respect to the third prong, ECMC takes the position that the bankruptcy court erred in finding that Mr. O'Hearn had not established this factor. In ECMC's view, the record establishes that, rather than face up to his obligation to pay his student loans, Mr. O'Hearn has pursued a course of building an equity interest in his fiancée's home. The bankruptcy court took a different view of the record, a view that appears to be based at least in part on the court's assessment of the credibility of the witnesses. We shall not disturb that determination.

**Conclusion**

On remand, the bankruptcy court should address the matters we have noted in the course of this opinion. Although our review of the ultimate issue of "undue hardship" is de novo, that review ought to be predicated on an analysis that fully takes into account the record developed by the parties. The bankruptcy court is free to reassess its views or to reaffirm those already stated, albeit with a more plenary explanation. We shall leave to the discretion of the bankruptcy court whether considerations of fairness and substantial justice require that the parties be permitted to supplement the record with additional evidence. For the foregoing reasons, the judgment of the district court is vacated and the case is remanded for further proceedings consistent with this opinion. The parties shall bear their own costs in this court.

VACATED and REMANDED

NO COSTS IN THIS COURT

A true Copy:

Teste:

_____

*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*