In re Bettie J. DURRANI, Debtor.

Bettie J. Durrani, Plaintiff,

v.

Educational Credit Management Corp., assignee for Citibank, USA, Defendant.

Bankruptcy No. 97 B 16918.
Adversary No. 02 A 1859.

United States Bankruptcy Court, N.D. Illinois, Eastern Division.

June 30, 2004.

Bettie J. Durrani, Chicago, IL, Pro Se.

Mark E. Shure, Kelly J. Mc Clintic, Keating & Shure, Ltd., Chicago, IL, for Defendant.

## MEMORANDUM OPINION

PAMELA S. HOLLIS, Bankruptcy Judge.

This matter comes before the court on the motion of Bettie J. Durrani for reconsideration of the order entering judgment in favor of Educational Credit Management Corp. on February 3, 2004. The parties each filed several memoranda in support of their positions. Having read the papers submitted and reconsidered the issues, the court grants the motion, vacates its February 3 order and finds that excepting Durrani's student loan debt from discharge would impose an undue hardship on her.

## BACKGROUND

The court held a trial on the complaint on September 12, 2003, and issued its order and judgment on February 3, 2004 (the "February 3 Order"). In the February 3 Order, the court found the outstanding sum due from Durrani to ECMC to be $58,881.19. The court further concluded that so long as Durrani was eligible to participate in the U.S. Department of Education's William D. Ford Direct Loan Program's Income Contingent Repayment Plan with a monthly payment of approximately $331.00, she could maintain a minimal standard of living while repaying the debt. The court further ordered that:

> If the William D. Ford Direct Loan Program's Income Contingent Repayment Plan is unavailable to Plaintiff, or if the monthly payment under the plan is substantially more than $331, this judgment is subject to reopening to reconsider whether it would be an undue hardship for Plaintiff to pay any portion of the remaining student loan balance.

Order at ¶ 4.

According to this motion for reconsideration and the extensive briefing from both parties that followed, Durrani's monthly payment under the ICRP would be approximately $395.00. Furthermore, the actual amount of the payment cannot be confirmed until Durrani signs a new promissory note. Finally, Durrani represents in her papers that she has been told she is ineligible for the ICRP unless the February 3 Order is vacated. Although ECMC

argues that Durrani can participate if ECMC releases the judgment previously entered by this court, it is not necessary to resolve that issue given the court's ruling today.

Based on the testimony at trial, the court made findings of fact [1], which are not reconsidered here, except for certain inferences drawn from those findings.

## FINDINGS OF FACT

1. Durrani attended Chicago State University from 1984 to 1993. She received a Bachelor of Arts degree in 1989 in Independent Studies and a Master of Science Degree in Corrections and Criminal Justice in 1993.

2. Between 1984 and 1990, Durrani took out twelve loans in amounts varying from $408.00 to $5,758.00, to finance the cost of her education. The total amount of these original loans was $24,682.00.

3. In March 1994, Durrani applied to consolidate those student loans. At that time, the balance due was $31,170.09. When the consolidation was approved, the total balance financed was $31,869.14. The repayment schedule required 48 payments of $239.02, starting on June 8, 1994, and 192 payments of $313.75, starting on June 8, 1998.

4. Durrani has been employed at Chicago State since May 16, 1989. Her current position is as an Academic Advisor at an annual salary of $36,312.00.

5. On April 30, 2003, the president of Chicago State wrote an open letter to the university community. She concluded that layoffs were necessary due to budget restrictions. Durrani's position was actually eliminated, but due to her seniority she obtained a transfer effective June 1, 2003. Durrani also testified that because of budget problems she has not received a raise in the past two years and does not expect one in the foreseeable future.

6. Durrani is approximately 51 years old and is eligible for retirement in November 2007. At the time she retires, Durrani will be eligible for a monthly retirement benefit from Chicago State in the amount of $1,020.00.

7. Durrani suffers from diabetes, high blood pressure, high cholesterol, poor vision and osteoarthritis in one knee. She has a permanent handicapped parking placard from the Illinois Secretary of State.

8. Durrani has consistently tithed to her congregation for over 20 years. In 2001, she tithed $1,706 and made additional offerings of $42. In 2002, she tithed $1,967 and made additional offerings of $37. Through May 18, 2003, she had tithed $1,105 and made additional offerings of $23.

9. Durrani requested and was granted two loan forbearances between September 1994 and September 1996.

10. Prior to filing her bankruptcy petition, Durrani made at least nine payments on the consolidated loan, four before the forbearances and five from the time the forbearances ended until she filed her petition.

11. Durrani filed for relief under Chapter 13 on June 2, 1997 and confirmed her plan on July 29, 1997. During the bankruptcy case, the Chapter 13 Trustee distributed $3,940.51 to ECMC's predecessor. This amount was 10% of the filed claim, pursuant

---

1. The court made an oral ruling on February 3, 2004, and distributed a written memorandum in support of that ruling. That written memorandum was attached to the February 3 Order as Exhibit A and incorporated therein.

to the plan. Interest continued to run on the unpaid portion of the loan. As of November 22, 2002, the principal balance was $39,651.17 and the accumulated interest was $15,007.32.

12. Durrani made all of the required payments under her plan and received her discharge on September 12, 2002. At the conclusion of the bankruptcy case, all of the interest that had accumulated during the case was capitalized into the principal, bringing the loan balance to $54,558.27. Durrani filed this complaint to discharge that loan under § 523(a)(8) on December 5, 2002, shortly after she completed her Chapter 13 payments.

13. Although there was testimony at the trial regarding her daughter's income, Durrani's post-trial surreply indicates that her daughter is now married.

14. Durrani's net monthly income is $2,241.00. She testified that Chicago State requires a $116 deduction for her retirement. Although her expenses have varied a small amount during the time this complaint has been pending, as of November 14, 2003, her monthly expenses were:

| | |
|---|---|
| Tithe | $ 226.00 |
| Rent | $ 505.00 |
| Electricity | $ 45.00 |
| Cooking Gas | $ 30.00 |
| House Phone | $ 65.00 |
| Credit Cards | $ 175.00 |
| Laundry | $ 55.00 |
| Groceries | $ 300.00 |
| Medical | $ 100.00 |
| Cable | $ 52.00 |
| Auto Insurance | $ 70.00 |
| Car Note | $ 100.00 |
| Car Maintenance | $ 95.00 |
| Renter's Insurance | $ 22.00 |
| Cell Phone | $ 40.00 |
| Gasoline | $ 90.00 |
| Household Supplies | $ 85.00 |
| Recreation | $ 20.00 |
| TOTAL | $2,075.00 |
| SURPLUS | $ 166.00 |

15. After post-trial questioning by the court, Durrani stated that the credit card expense was to pay for current necessities, and not to pay down old debt.

16. The William D. Ford Program, administered by the U.S. Department of Education, provides an Income Contingent Repayment Plan. Under this plan, a borrower's monthly repayment amount is based on income, and that monthly payment is capped at 20% of the borrower's income above the poverty line. Any amount that remains after 25 years of participation in the ICRP is discharged. Amy Schreiner, a paralegal for the ECMC, testified at trial that the purpose of the William D. Ford Program was to allow student loan borrowers a "fresh start."

17. At the time of the trial, evidence was submitted that Durrani's payment under the ICRP would be $331.33, and would drop to $54.33 after her retirement.

18. Durrani testified that she often called whichever entity was currently holding her loan to discuss the status of her loan and payments she had made or would be making.

19. The parties agree that since Durrani's household size has been reduced from two to one, her estimated payment under the ICRP would be between $390.00 and $395.00.

## CONCLUSIONS OF LAW

**A. The *Brunner* Test is the Standard for Determining Whether Excepting a Student Loan From Discharge Would Impose an Undue Hardship on the Debtor, and Has Been Adopted by the Seventh Circuit.**

When considering a request for relief under 11 U.S.C. § 523(a)(8), this court

is bound by *Matter of Roberson,* 999 F.2d 1132 (7th Cir.1993), which adopted the *Brunner* test used by several circuits. *Brunner v. New York State Higher Education Services Corp.,* 831 F.2d 395 (2nd Cir.1987) (per curiam). The three questions set forth in *Brunner* frame the issue of whether excepting a student loan debt from discharge will impose an undue hardship on the debtor. Accordingly, the issues that must be resolved in the instant proceeding are:

1. Whether, based on current income and expenses, Durrani can maintain a "minimal" standard of living for herself if forced to repay the loan;

2. Whether additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of the loan; and

3. Whether Durrani has made good faith efforts to repay the loan.

Durrani has the burden of proving each element of the *Brunner* test by a preponderance of the evidence. Although the *Brunner* test uses objective standards, the decision is still ultimately at the discretion of this Court to use its "intuitive" sense of what is a "minimal" standard of living and what is "good faith." *See* 4 *Collier on Bankruptcy,* ¶ 523.14[2] (15th ed. rev'd 2003).

Although many courts still adhere to a restrictive interpretation of *Brunner,* other recent decisions have been less formulaic. For example, a recent BAP decision from the 9th Circuit reversed a bankruptcy court that had denied dischargeability after finding a lack of "exceptional circumstances" under *Brunner's* second prong. *Nys v. ECMC,* 308 B.R. 436 (9th Cir. BAP 2004). Instead, the BAP instructed the lower court to reconsider the second prong of the test:

The circumstances need be "exceptional" only in the sense that they demonstrate insurmountable barriers to the debtor's financial recovery and ability to pay. The court may consider any number of circumstances that relate to future ability to pay. Depending on the case, the debtor's age, training, physical and mental health, education, assets, ability to obtain a higher paying job or reduce expenses, and other factors not listed here may be relevant. The test is, by its nature, case-by-case.

*Id.* at 444.

Similarly, the Tenth Circuit recently handed down a decision affirming the discharge of a debtor's student loans. It was an opportunity for the Circuit to provide guidance to its lower courts on the undue hardship standard, since it had not yet designated a test. Although the panel adopted *Brunner,* it did so with a focus on the overriding goal of the Bankruptcy Code that honest but unfortunate debtors be provided with a fresh start:

Many subsequent courts employing the *Brunner* analysis ... appear to have constrained the three *Brunner* requirements to deny discharge under even the most dire circumstances....

These applications show that an overly restrictive interpretation of the *Brunner* test fails to further the Bankruptcy Code's goal of providing a "fresh start" for the honest but unfortunate debtor, and can cause harsh results for individuals seeking to discharge their student loans.

*ECMC v. Polleys,* 356 F.3d 1302, 1308 (10th Cir.2004) (citations omitted). Consequently, the *Polleys* panel cautioned that *Brunner* "must be applied such that debtors who truly cannot afford to repay their loans may have their loans discharged." *Id.* at 1309.

■ This court is bound by the Seventh Circuit's interpretation of *Brunner* as set forth in *Roberson* and reinforced in *In re O'Hearn*, 339 F.3d 559 (7th Cir.2003). In O'Hearn, the bankruptcy court's decision to grant a hardship discharge was vacated by the court of appeals and remanded for development of the record consistent with the appellate court's comments. In its opinion, the appellate court raised several issues that are not present in this case. The debtor O'Hearn testified he did not have any health problems that impaired his ability to work. The opposite is present here. Durrani suffers from diabetes and other disabilities sufficient enough to qualify for a permanent handicapped parking placard from the Illinois Secretary of State. O'Hearn also paid $1,402 per month to his fiancée to live in her house although he received no equity interest. The bankruptcy court found that he could rent a two bedroom in the area for less than $1000 per month. The ECMC also argued that O'Hearn pursued a course of building an equity interest in his fiancee's home in lieu of honestly attempting to pay down his educational debts. Again the circumstances are quite different here as Durrani's living arrangements are modest; she pays $505 a month to rent and owns no real estate or contributes to anyone else's purchase of real estate as occurred in O'Hearn. Finally, O'Hearn was able to come up with a lump sum payment offer of $30,000 to ECMC, comprised of savings and family contributions. After ECMC rejected this offer because over $50,000 was owed, O'Hearn stopped making any payments. In contrast, Durrani has no savings or significant assets of any kind to make such an offer, yet she has continued to attempt payments when able. Even following the "path that gave ample recognition to the term 'undue'," 339 F.3d at 564, this court finds that Durrani has satisfied the *Brunner* factors.

## B. The Second Prong—Whether Additional Circumstances Exist Indicating That This State of Affairs is Likely to Persist for a Significant Portion of the Repayment Period.

Additional circumstances exist such that Durrani's present situation is likely to persist for a significant portion of the repayment period of her student loan. Durrani is approximately 51 years old and is eligible for retirement in November 2007 from the only employer she has had since completing her education. *See, e.g., O'Hearn,* 339 F.3d at 566 n. 6 noting that "the court properly considered Mr. O'Hearn's age [50] in forecasting his future prospects". Durrani submitted evidence demonstrating that her income will drop to $1,020 per month upon retirement. She suffers from diabetes, high blood pressure, high cholesterol, poor vision and osteoarthritis in one knee. Although her testimony regarding her physical condition was credible on its own, it is bolstered by the fact that she has a permanent handicapped parking placard from the Illinois Secretary of State. Furthermore, Durrani submitted evidence that she has no reasonable expectation of a raise in the near future; in fact, her position was recently eliminated due to budget constraints and she was only able to transfer to a new position at Chicago State because of her seniority. She has maximized her career potential; there is no concern that Durrani trying to shed this student loan on the eve of a lucrative career. There was no testimony to indicate that Durrani could have found a better-paying position but forsook a higher salary for the noble purpose of serving in academia. For all of these reasons, additional circumstances exist beyond a mere current inability to pay.

## C. The Third Prong—Whether Durrani Has Made Good Faith Efforts to Repay the Debt.

Durrani has made good faith efforts to repay this loan. She made at least nine payments on the consolidated loan between 1994 and 1997, when she filed for bankruptcy protection. During the pendency of her Chapter 13 case, ECMC's predecessor received 15 payments on the loan, totaling 10% of the amount of its proof of claim. After seeking relief under Chapter 13 in 1997, Durrani actually completed her plan and received a discharge of her other debts. The fact that she completed her plan is strongly indicative of Durrani's good faith and her commitment to repay her debts. According to one source, only about "one-third of chapter 13 debtors complete their repayment plans." Ed Flynn, Gordon Bermant and Karen Bakewell, "A Tale of Two Chapters: Financial Data," 21 AM. BANKR. INST. J. 20 (October 2002).

Furthermore, Durrani submitted evidence that she engaged in extensive communications with each entity holding her student loans. Durrani has not attempted to evade these creditors; instead, the evidence shows that she has been forthright and assertive in dealing with this obligation.

The facts in *Brunner*, the seminal "undue hardship" case, provide a clear example of a debtor who has not made a good faith effort to repay her loans. Marie Brunner sought a discharge of her student loan debts "within a month of the date the first payment of her loans came due. Moreover, she did so without first requesting a deferment of payment...". 831 F.2d at 397. At the time of the hearing in bankruptcy court, only ten months had passed since Brunner had graduated from her master's program.

The facts in this case could not be more different. Durrani incurred this debt over a period that ended 12 years before she filed her § 523(a)(8) complaint. She consolidated the loans in 1994, and received two forbearances between 1994 and 1996. In addition to the payments she made before filing, Durrani paid 10% of the loan amount through her Chapter 13 plan. Durrani has easily satisfied the third prong of the *Brunner* test.

## D. The First Prong—Whether, Based on Current Income and Expenses, Durrani Can Maintain a "Minimal" Standard of Living For Herself If Forced to Repay the Debt.

The remaining question is whether, based on current income and expenses, Durrani can maintain a "minimal" standard of living for herself if forced to repay this loan. In the February 3 Order, the court concluded that Durrani did not satisfy this prong. The basis for this ruling was the finding that Durrani could afford the minimum payment of $331.00 under the ICRP. Since new allegations indicate that the ICRP payment will be nearly $400.00, the court will reconsider the inferences it drew and the conclusions it made under this prong.

### 1. Whether Durrani Must Stop Tithing to Reduce Her Expenses.

■ The first question is whether Durrani must eliminate her $226.00 monthly tithe. Pursuant to the Religious Liberty and Charitable Donation Protection Act of 1997, Congress determined that charitable contributions to a qualified religious organization up to 15 percent of the gross income of a debtor may not be included in the calculation of that debtor's disposable income. 11 U.S.C. § 1325(b)(2)(A).

At least two courts have held that since the RLCDPA made no changes to

§ 523(a)(8), the Act does not automatically allow debtors to classify tithing as an allowable expense. *See ECMC v. McLeroy*, 250 B.R. 872, 880 (N.D.Tex.2000); *Ritchie v. Northwest Educ. Loan Ass'n*, 254 B.R. 913, 919–921 (Bankr.D.Idaho 2000).

Other courts, however, have rejected the strict reading of the RLCDPA found in *McLeroy* and *Ritchie*. *See Meling v. U.S. Dept. of Educ.*, 263 B.R. 275, 279 (Bankr. N.D.Iowa 2001), *aff'd*, 2002 WL 32107248 (N.D.Iowa January 22, 2002); *Lebovits v. Chase Manhattan Bank*, 223 B.R. 265, 273 (Bankr.E.D.N.Y.1998). At least one Illinois bankruptcy court concluded that the disposable income standard in § 1325(b)(2) should be used for the "minimal living standard" analysis under § 523(a)(8). *See Robinson v. ISAC*, 2002 WL 32001246, *3 (Bankr.C.D.Ill. Oct.22, 2002).

In the written memorandum incorporated by reference into the February 3 Order, the court concluded that a bankruptcy judge should not override a debtor's commitment to tithing. Durrani was very credible in her testimony regarding her belief that the money she tithes does not belong to her and that she cannot make those funds available for her creditors. The court notes that while in her budget Durrani indicates that she tithes $226.00 per month, the records from her church do not completely support this contention. According to these contribution statements, her average monthly tithe was $142.17 in 2001 and $163.92 in 2002. In response to this court's question on the discrepancy, Durrani indicated that some contributions were made by dropping cash into the basket as it passes around at church or through other means that would not generate a receipt. The court will therefore not take into account the additional funds that could be available if she reduced her contributions in the future.

## 2. Whether Other Expenses Should be Reduced to Reflect a "Minimal" Standard of Living.

There are other expenses in Durrani's budget that the court previously questioned. However, upon reconsideration, it is a very close call as to whether Durrani could actually afford the $331.00 monthly payment under the ICRP. For example, the court previously took issue with the $175.00 monthly expense for "credit cards." In the February 3 Order, the court was concerned that the credit card companies were new creditors who were receiving payment while ECMC continued to wait.

Having reconsidered all of the facts before the court, however, the more appropriate inference to draw is that Durrani's budgeted expenses do not reflect the money she is actually spending to maintain a minimal standard of living. In other words, the $175 "credit cards" expense is akin to a line item for unexpected monthly expenses. Considering that Durrani suffers from numerous physical ailments, the $100 she budgets each month for "medical" may not be sufficient to cover her actual costs. The court also notes that there is no line item for "clothing." While a minimal standard of living would not include lavish shopping expeditions, it is unrealistic to expect that a person who works in a professional environment would spend nothing on clothing each year. Neither is there a line item for household repairs or furniture, beyond $85.00 per month for "household supplies."

■ Upon reconsideration, the $52.00 monthly expense for cable also is not inappropriate. "While the Debtors' budget may not be as spartan as it could be, the amount which could be further wrung out would not be sufficient to make the difference required here." *Buracker v. Student Loan Marketing Ass'n*, 2004 WL 950771,

at *3 (Bankr.C.D.Ill. May 3, 2004) ($86.00 monthly cable/Internet expense did not preclude finding that excepting a HEAL loan from discharge would be unconscionable, which is a harsher standard than "undue hardship").

■ Durrani's budgeted expenses reflect a "minimal" standard of living. Unlike the debtor in *O'Hearn,* 339 F.3d at 565–566, she does not live in a 2000 square foot, four bedroom house. Instead, Durrani's budget indicates that she lives modestly with a monthly rent payment of $505.00. The *O'Hearn* panel criticized the bankruptcy court for allowing the debtor to justify his high rent by ignoring the fact that "[m]any couples are forced to live in less appealing housing because of the financial obligations undertaken by one or the other." *Id.* at 565. Durrani's housing choice is already "less appealing." She indicated at oral argument that although she is unable to because of her credit history, she would like to move because her neighborhood is not safe. She also raised this concern in addressing the court's earlier observation that a cell phone is not a necessity: "Where Plaintiff lives, having a cell phone is a necessity. It's a safety issue." Plaintiff's Supplemental Reply Brief, at 6.

Therefore, upon reconsideration, the court determines that it erred in holding that based on her current income and expenses Durrani can maintain a minimal standard of living if forced to repay the loan under the ICRP.

### 3. The First Prong of Brunner Asks Whether the Debtor Can Maintain a "Minimal" Standard of Living if Forced to *Repay the Loan,* Not Whether She Has Any Surplus Income.

■ The question framed by *Brunner* in this first prong is whether Durrani can maintain a minimal standard of living if she is required *to repay this loan,* not whether she has any surplus in her budget available for a monthly payment. It is uncontroverted that Durrani has some money available each month because even without the court's inquiry into her expenses, Durrani's budget showed a modest surplus of $166.00.

The amount of this loan was $58,881.19 on February 3, 2004, and it has been accruing interest since that date. Assuming an 8.25% interest rate, which according to Exhibit A of ECMC's March 24, 2004, Supplemental Response In Opposition to Plaintiff's Motion to Reconsider, is the highest interest rate that can be charged under the consolidated loan, Durrani's loan is accruing interest at a per diem rate of $13.68. Supplemental Response at 3. In March, for example, $424.08 ($13.68 × 31) accrued in simple interest.

As a result, if Durrani made the minimum ICRP payment of $331, the loan would never be paid off but instead would continue to grow. Even under the $390—$395 monthly payment that triggered this motion for reconsideration, Durrani's payments would be insufficient to cover the interest. Once Durrani retires and her income drops to $1,020 per month, an event that is likely to happen relatively soon, her payment under the ICRP would also be reduced and even less interest would be paid each year. Consequently, even if Durrani could afford the ICRP payment—which the court has not found she can do—enrolling in the ICRP would result in negative amortization and the amount of this loan would continue to grow throughout the 25 year repayment term. Clearly Durrani cannot maintain a minimal standard of living and repay this loan.

#### 4. The ICRP is Only One Factor for a Court to Consider in Determining Whether Undue Hardship Exists.

■ Furthermore, the availability of the ICRP cannot be a magic wand that when waved precludes discharge of a student loan debt. *See Cheney v. ECMC,* 280 B.R. 648, 665 (N.D.Iowa 2002) ("the William D. Ford Program is no silver bullet for student loan creditors to avoid discharge of student loan debts owing to undue hardship if the creditors ... demonstrate that a particular debtor did in fact know about and understand such alternatives for resolving student loan debts"); *Korhonen v. ECMC,* 296 B.R. 492, 496 (Bankr.D.Minn. 2003).

This must especially be true where, as in this case, the debtor cannot realistically afford to make the payments required by the ICRP. *See, e.g., Alderete v. ECMC,* 308 B.R. 495, 507 (10th Cir. BAP 2004) (determining that the bankruptcy court gave too much weight to the existence of the ICRP where "the evidence showed that even if eligible, the Debtors could not have made their Ford Program payments").

#### a. Courts Have Found Undue Hardship Even Where the ICRP Payment Would Be Zero.

There are numerous published cases where a debtor's monthly payment under the ICRP would be $0.00—obviously an amount that any debtor can pay while maintaining a minimal standard of living—yet the court found the existence of undue hardship and determined that the student loan was dischargeable. *See Cheney,* 280 B.R. 648 (under the 8th Circuit's "totality of the circumstances" test); *Fahrer v. Sallie Mae Servicing Corp.,* 308 B.R. 27 (Bankr.W.D.Mo.2004) ("totality of the circumstances" test); *Johnson v. ECMC,* 299 B.R. 676, 683 (Bankr.M.D.Ga.2003); *Cota*

*v. U.S. Dept. of Educ.,* 298 B.R. 408, 421 n. 16 (Bankr.D.Ariz.2003) ("The logic of applying for a program that allows the debtor a $0 'payment' as a precondition to a finding of a debtor's good faith, is lost on the court."); *Korhonen,* 296 B.R. 492 ("totality of the circumstances" test); *Gregoryk v. U.S. Dept. of Educ.,* 2001 WL 1891469 (Bankr.D.N.D. March 30, 2001) ("totality of the circumstances" test); *Herrmann v. U.S. Dept. of Educ.,* 2000 WL 33961388 (Bankr.C.D.Ill. Feb.7, 2000); *Thomsen v. Dept. of Educ.,* 234 B.R. 506, 512 (Bankr.D.Mont.1999) (even though monthly payment would be zero under the ICRP, the first *Brunner* prong "requires simply that the Debtors show they cannot repay the loans and maintain a minimal standard of living").

■ Instructive in this matter is the case of *Newman v. ECMC,* 304 B.R. 188 (Bankr.E.D.Pa.2002) (considering whether summary judgment was appropriate on § 523(a)(8) complaint). The *Newman* debtor's monthly payment under the ICRP would have been zero, and defendant ECMC therefore argued that the debtor's refusal to participate in the ICRP required a finding that she was not acting in good faith. In denying ECMC's motion for summary judgment, the *Newman* court stated:

> [W]hile consideration of the debtor's repayment options is one factor that a court may consider in determining "undue hardship" under the totality of the circumstances, I am unaware of any decision which holds that the availability of the William D. Ford Federal Direct Loan Program to a debtor—including its "income contingent repayment plan" option—by itself requires a finding that it would not be an "undue hardship" to repay the student loan obligation.

304 B.R. at 195. The fact that a debtor can afford the monthly ICRP payment is

not dispositive as to whether she can maintain a minimal standard of living while repaying her student loan.

### b. The Existence of the ICRP Cannot Obliterate the Bankruptcy Code's "Fresh Start" Policy.

There were numerous reasons provided in the zero payment cases, as well as in other undue hardship cases, for considering the availability of the ICRP as merely one factor in the dischargeability decision. First, the bankruptcy process is fundamentally about providing "honest but unfortunate" debtors with a fresh start. *See Grogan v. Garner,* 498 U.S. 279, 286–287, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991). The Supreme Court has observed that a

> central purpose of the Code is to provide a procedure by which certain insolvent debtors can reorder their affairs, make peace with their creditors, and enjoy "a new opportunity in life with a clear field for future effort, unhampered by the pressure and discouragement of preexisting debt." *Local Loan Co. v. Hunt,* 292 U.S. 234, 244, 54 S.Ct. 695, 78 L.Ed. 1230 (1934).

*Grogan,* 498 U.S. at 286, 111 S.Ct. 654.

*See Grawey v. Illinois Student Assistance Comm'n,* 2001 WL 34076376, at *6 (Bankr.C.D.Ill. Oct.11, 2001) ("Unlike the income contingent repayment plan, bankruptcy relief is designed to give the honest but unfortunate debtor a fresh start. And although government guaranteed student loans are meant to be more difficult to discharge than general unsecured debts, they are not meant to be impossible to discharge."); *Polleys,* 356 F.3d at 1309 ("to better advance the Bankruptcy Code's 'fresh start' policy ... the terms of the [*Brunner* ] test must be applied such that debtors who truly cannot afford to repay their loans may have their loans discharged"); *Alston v. U.S. Dept. of Educ.,* 297 B.R. 410, 417 (Bankr.E.D.Pa.2003) (the

argument that a debtor might be able to make some payments during the 25 year repayment period "loses sight of Congress' intent that bankruptcy relief provide the debtor with a fresh start"); *Korhonen,* 296 B.R. at 497 ("unlike the Income Contingent Repayment Plan, bankruptcy relief is designed to give the honest but unfortunate debtor a fresh start").

When Congress first determined that educational loans should be presumptively excepted from discharge, it was because

> it believed that many student borrowers were abusing the "fresh start" policy by filing for bankruptcy and obtaining discharge of educational debt soon after graduation, before making any significant attempts at repayment. Congress permitted the discharge of educational debt, however, if the bankruptcy petition was filed at least five years after the loans first became due. The enactment of the five year nondischargeability period thus reflected the congressional purpose of shielding the government guaranteed educational loan program from opportunities for abuse.

*Hiatt v. Indiana State Student Assistance Comm'n,* 36 F.3d 21, 24 (7th Cir.1994) (citations omitted), *cert. denied,* 513 U.S. 1154, 115 S.Ct. 1109, 130 L.Ed.2d 1074 (1995).

The five year nondischargeability period was statutorily extended to seven years, and has now been entirely eliminated. But the "fresh start" policy is still integral to the bankruptcy process, and cannot be ignored. Durrani took out her first student loan in 1984. If she is forced to participate in the ICRP, she will not be free of this student loan debt until 2029. Despite the testimony of an ECMC witness that the purpose of the ICRP is to allow student loan borrowers a fresh start, binding Durrani to her debt until 2029

would give no weight whatsoever to the notion that at some point, honest but unfortunate debtors are entitled to a fresh start.

### c. The Discharge of a Student Loan After the 25 Year ICRP Term is a Taxable Event.

■ The court must also take into account the considerable tax burden that will be borne by Durrani if she does participate in the ICRP for the full 25 year term. The ICRP provides that any portion of the debt that is not paid will be discharged at the end of 25 years. However, that discharge of indebtedness, unlike a discharge in bankruptcy, results in income that Durrani would have to recognize for taxable purposes. As several cases have noted, the result is that she would still face a nondischargeable debt after the repayment period has run:

> That conclusion [that the debtors satisfied the second *Brunner* prong] is not changed, as Defendant urges, because Debtors' loans would be discharged after 25 years. In that event the unpaid amount, together with the interest which will have accrued in 25 years, would be discharged by the Defendant and treated as taxable income. In other words, the Debtors would simply exchange one huge nondischargeable debt for educational loans for another in the form of nondischargeable income taxes. See 11 U.S.C. § 523(a)(1). Under these circumstances of clear and undue hardship, this Court deems the better result is to discharge the Debtors' educational loan debt, which they have no prospect of ever repaying, now and give the Debtors the benefit of a fresh start.

*Thomsen,* 234 B.R. at 514. *See also Grawey,* 2001 WL 34076376, at *6; *Gregoryk,* 2001 WL 1891469, at *3. *Compare Archibald v. United Student Aid Funds, Inc.,* 280 B.R. 222, 229–230 (Bankr.S.D.Ind. 2002) (giving little weight to the tax implications of the ICRP where debtor "will likely obtain employment more in line with her educational qualifications, making the income tax treatment of a fully or near fully paid off loan negligible").

### d. There Are Emotional Aspects to the Denial of Dischargeability That May Be Considered.

■ The psychological and emotional toll on a debtor that results from adding 25 years to the life of a student loan should not be overlooked. This is especially true where, as here, the debtor first incurred the debt between 14 and 20 years ago. *See, e.g., Fahrer,* 308 B.R. at 36 (acknowledging that "[i]n a different context, the Court might give more weight to the availability of the ICRP and a debtor's refusal to apply for participation in that program," but under the circumstances, the substantial emotional toll on the debtor would only be "compounded and exacerbated if the Debtor remains responsible for $180,000 in student loan debt, a sum which will increase with accruing interest and which ultimately may not be resolved for a quarter of a century"); *Herrmann,* 2000 WL 33961388, at *4 (discharging student loans where debtor who "will never have the income to make payments on her student loans ... should not have to have these student loans hanging over her head for another 25 years ..."). Although Durrani will never be able to pay off this loan, she will be burdened by a huge and growing obligation that remains on her credit record, and arguably, according to Durrani, condemns her to remaining in a neighborhood that is becoming increasingly unsafe, because the loan obligation blocks her ability to rent from another landlord who would perform a credit check.

### e. If a Debtor Who Is Eligible To Participate in the ICRP Could Never Show Undue Hardship, the Effect is the Impermissible Substitution of an Administrative Formula for a Bankruptcy Judge's Discretion.

■ Finally, the decision whether to allow debtors to discharge a student loan is committed to the discretion of the bankruptcy judge, using the three part test set forth originally in *Brunner*. Courts must not turn to the ICRP as a substitute for the thoughtful and considered exercise of that discretion. To do so would be to abandon all decision-making responsibility and convert a § 523(a)(8) adversary into a rote and meaningless exercise.

If Congress had intended the question of dischargeability of student loans to be delegated to a nonjudicial entity, no matter how fair its formulas and intentions may appear, it could have provided for such. As attractive as it may be to postpone the decision and to rely on the long-term supervision afforded by the ICRP and the apparent fairness of its continuing review of a debtor's income as compared to the established poverty standard, the Court will discharge its duty as provided in the Code and make a present determination of dischargeability.

*Johnson*, 299 B.R. at 682. *See In re Nys*, 2003 WL 22888941, at *1 (Bankr.N.D.Cal. Aug.11, 2003) ("Testimony in this and other cases has convinced the court that some officials of the Ford Program are compassionless number-crunchers and that determinations as to how much a debtor can afford to pay are much better left to the courts."), *reversed and remanded*, 308 B.R. 436 (9th Cir. BAP 2004) (to reconsider finding of nondischargeability); *Herrmann*, 2000 WL 33961388, at *3 ("The Department of Education may not usurp the judicial function of determining undue hardships by promulgating regulations governing the repayment of student loans.").

For all of these reasons, the court finds that based on current income and expenses, Durrani cannot maintain a "minimal" standard of living for herself if she is forced to repay this debt.

## CONCLUSION

The court previously found that Durrani satisfied the second and third *Brunner* prongs, and has set forth its reasoning more fully in this opinion. Upon reconsideration, the court now finds that Durrani has satisfied the first *Brunner* prong as well.

Therefore, Durrani has met her burden of showing that excepting the debt to ECMC from discharge would impose an undue hardship upon her, pursuant to 11 U.S.C. § 523(a)(8). The motion for reconsideration is granted, and Durrani's debt to ECMC is discharged.