In re Sandra Jane FRUSHOUR,
Debtor.

Educational Credit Management
Corporation, Plaintiff–
Appellant,

v.

Sandra Jane Frushour, Defendant–
Appellee.

No. 04–2553.

United States Court of Appeals,
Fourth Circuit.

Argued Sept. 20, 2005.

Decided Dec. 30, 2005.

396

these loans unless the debtor would endure an "undue hardship" in remaining obligated to repay them. *See* 11 U.S.C. § 523(a)(8) (2000). The bankruptcy court held that the debtor in this case satisfied the undue hardship requirement, and the district court affirmed.

We hold that the debtor failed to prove undue hardship both because she provided no exceptional circumstances over and above her present inability to pay her debt, and because she failed to seriously consider loan consolidation measures that would greatly reduce her current payments. Congress sought to ensure repayment of educational loans through its use of the term "undue" and the courts are obligated to follow its imperative. We accordingly reverse the judgment of the district court.

Julie K. Swedback, Educational Credit Management Corporation, St. Paul, Minnesota, for Appellant. Bernard Joseph Podurgiel, Cambridge, Massachusetts, for Appellee.

Before WILKINSON and WILLIAMS, Circuit Judges, and HAMILTON, Senior Circuit Judge.

**OPINION**

WILKINSON, Circuit Judge.

A debtor in bankruptcy cannot discharge government-guaranteed educational loans through the normal channels. Congress instead protected the financial integrity of the student-loan program by precluding a debtor from discharging

I.

The debtor, Sandra Jane Frushour, filed for bankruptcy on December 24, 2003, to discharge her debts under Chapter 7 of the Bankruptcy Code. *See* 11 U.S.C. § 701 et seq. Frushour owed $12,148.70 in student-loan debt as of March 14, 2004. The original principal on this debt was $11,688. The debtholder, Educational Credit Management Corporation (ECMC), is a nonprofit corporation that administers government-guaranteed student loans. On March 2, 2004, Frushour filed an adversary complaint against ECMC to discharge her student-loan debt as an undue hardship under 11 U.S.C. § 523(a)(8). Both parties agree that § 523(a)(8) is the relevant provision for Frushour's student loans.

At the time of the adversary proceeding, Frushour was in her forties and had a seven-year-old son for whom she received no child support. She had gone to college for several years with the help of her student loans. Between 1986 and 1993,

she attended the University of South Carolina Coastal Carolina College, California State University, and Long Beach City College. She was an arts major at Coastal Carolina and obtained an associate's degree with an emphasis in tourism from Long Beach City College in 1993.

Frushour has been employed in a variety of different jobs since she obtained her degree in 1993. She worked in restaurant management in California from 1994 to 2000. Specifically, she managed a high-end tourist restaurant, the Queen Mary, in Long Beach, and continued in a similar line of work in Huntington Beach. During Frushour's first few years in restaurant management, she made between $18,000 and $20,000 per year. After her son was born, however, she made significantly less money per year, between $7,000 and $10,000. In 2000, Frushour decided to move to Florida. She obtained a Florida real estate license, and worked in the resort sales industry. Frushour made approximately $20,000 in 2000 and $15,000 in 2001. Sadly, however, tourism sales declined after the events of September 11, 2001. Frushour thus moved again.

This time, she decided to return to South Carolina to be with her ailing sister and aging mother. She started her own company, and has been self-employed ever since. Frushour specializes in interior design and decorative painting, returning to her goal of working in the arts and using the art education that she received at Coastal Carolina. In her current capacity, Frushour provides architects and interior designers with artistic backdrops for walls. She is her own marketer, through cold calls and referrals, and does the artistic work herself. In 2002, she made approximately $7,395, and in 2003 her income increased to $10,771.

Frushour's living situation at the time of the adversary proceeding was anything but desirable. Her expenses exceeded her income, even excluding the loan repayments. She earned a gross income of $998 and a net income of $918 per month. Her expenses were $1,022 per month. These monthly expenses included $300 for food, $200 for rent, $100 for clothing, $95 for cable and Internet, $75 for electricity, $75 for transportation, $66 for telephone, $61 for car insurance and taxes, and $50 for water and sewer. Frushour had no child-care costs because she regularly worked from home. She also had no expenses for medical insurance and she drove a used Volvo with over 250,000 miles on it.

Frushour has repaid her student loans on an inconsistent basis. She was obligated to start making payments in 1994, but she was able to obtain forbearance until July 1998. As a result, she started making loan repayments in August 1998. She made about twenty-three consistent payments from that time until approximately June 2000. The record is ambiguous as to the exact amount of these payments, but it was either $113.41 or $189 per month. She has not made payments on her own initiative since 2000. Nonetheless, the IRS seized her 2002 tax refund of $1,905 and applied it to her student loans. Frushour believes that it may have done the same in 2003, since she has yet to receive her tax refund of $910 for that year either.

After Frushour filed this complaint to discharge her student-loan debt, ECMC brought to her attention that she qualified for several consolidation plans through the William D. Ford Direct Loan Program, the federal program that makes available educational loans. One of these plans is income contingent. Under this plan, a debtor's payment is twenty percent of the difference between her gross income and the federal poverty guidelines for her family size. *See* 34 C.F.R. § 685.209(a)(2)-(3)

(2004). If Frushour consolidates under this plan, she would have a payment of between zero and five dollars per month unless her income increased. She would be obligated to make payments for twenty-five years, but at the end of that period her remaining debt would be discharged. *Id.* § 685.209(c)(4)(iv). If her income level rises such that she would have to make larger payments, she could switch to a fixed-payment plan. *Id.* § 685.210. She refused to participate in any of these consolidation plans because she stated they were not right for her and she wanted a fresh start.

■ The bankruptcy court discharged Frushour's student-loan debt because it held that she proved an "undue hardship" under 11 U.S.C. § 523(a)(8). It applied a three-part test first adopted by the Second Circuit to determine whether she did so. *See Brunner v. N.Y. State Higher Educ. Servs. Corp.*, 831 F.2d 395, 396 (2d Cir. 1987) (per curiam). The *Brunner* test requires a debtor to show that (1) she cannot maintain a minimal standard of living and repay the loans, (2) additional circumstances exist that illustrate she will not be able to repay the loans for a substantial part of the repayment period, and (3) she attempted to repay the loans in good faith. *Id.* The bankruptcy court held that she proved all three factors.

The district court affirmed. As to the first prong, it noted that Frushour maximized her income and minimized her expenses, but her expenses still exceeded her income. With regard to the second, it held that given her employment history, she was not likely to make more money in the future. Further, she had testified that she anticipated more expenses for her son, as he grew older, and for her worn automobile, as it required additional repair. It also noted that she has no health care or money for home maintenance, and she

would likely have to direct any increased income to these needs. Finally, the district court held that Frushour satisfied the final prong because, although she did not accept a loan consolidation plan, she paid the loans during years when her income was greater than it currently is.

## II.

■ Before reaching the merits of this case, we must resolve a dispute over the appropriate standard of review. We review directly the bankruptcy court's decision. *Banks v. Sallie Mae Servicing Corp. (In re Banks)*, 299 F.3d 296, 300 (4th Cir.2002). All agree that we review the bankruptcy court's legal conclusions de novo and its factual findings for clear error. *Id.* Dispute arises, however, over whether we review the ultimate determination of undue hardship under a de novo or clearly erroneous standard.

■ Whether a debtor has met the undue hardship standard is a legal conclusion that is based on the debtor's individual factual circumstances. It is thus a mixed question of law and fact. As we have explained in a related context, these types of questions are reviewed "under a hybrid standard, applying to the factual portion of each inquiry the same standard applied to questions of pure fact and examining de novo the legal conclusions derived from those facts." *U.S. Dep't of Health & Human Servs. v. Smitley*, 347 F.3d 109, 116 (4th Cir.2003) (internal quotation marks omitted) (reviewing de novo the bankruptcy court's legal conclusion that a debtor met the "unconscionable" standard required to discharge a Health Education Assistance Loan). Several of our sister circuits have reached the same conclusion in the undue hardship context. *See, e.g., Tirch v. Pa. Higher Educ. Assistance Agency (In re Tirch)*, 409 F.3d 677, 680 (6th Cir.2005); *U.S. Dep't of Educ. v. Ger-*

*hardt (In re Gerhardt)*, 348 F.3d 89, 91 (5th Cir.2003). We therefore review de novo the determination of whether a debtor has met the undue hardship standard, and we review the factual underpinnings of that legal conclusion for clear error.

## III.

A discharge under Chapter 7 does not ordinarily discharge government-backed student-loan debt, because Congress expressly excluded this debt from the regular bankruptcy procedures. It provided that

> [a] discharge under [certain sections of the Bankruptcy Code] does not discharge an individual debtor from any debt ... (8) for an educational benefit overpayment or loan made, insured or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit or nonprofit institution, or for an obligation to repay funds received as an educational benefit, scholarship or stipend, *unless excepting such debt from discharge under this paragraph will impose an undue hardship on the debtor and the debtor's dependents.*

11 U.S.C. § 523(a)(8) (emphasis added).

■ A debtor seeking to discharge government-guaranteed educational loans thus faces a difficult burden, because she must show that not discharging the debt would impose an undue hardship. Congress, however, neither defined "undue hardship" nor provided standards for what it entails. *See O'Hearn v. Educ. Credit Mgmt. Corp. (In re O'Hearn )*, 339 F.3d 559, 564 (7th Cir.2003).

■ Nonetheless, the ordinary meaning of "undue" gives us clear guidance. "Undue" generally means "unwarranted" or "excessive." *See The Random House Dictionary of the English Language* 2066 (2d

ed.1987). Because Congress selected the word "undue," the required hardship under § 523(a)(8) must be more than the usual hardship that accompanies bankruptcy. Inability to pay one's debts by itself cannot be sufficient; otherwise all bankruptcy litigants would have undue hardship. The exception would swallow the rule, and Congress's restriction would be meaningless. As a result, "[t]he existence of the adjective 'undue' indicates that Congress viewed garden-variety hardship as insufficient excuse for a discharge of student loans." *Rifino v. United States (In re Rifino )*, 245 F.3d 1083, 1087 (9th Cir. 2001) (internal quotation marks omitted).

In enacting the undue hardship standard, Congress had to take into account the viability of the student-loan program. That program serves valuable purposes. It affords individuals in all walks of life the opportunity to obtain an education, and with it the mobility and financial stability that an education can provide. Indeed, without the program, many people would never receive any higher education, because their credit risks would preclude them from obtaining private commercial loans. *Brunner v. N.Y. State Higher Educ. Servs. Corp.*, 46 B.R. 752, 756 (S.D.N.Y.1985), *aff'd*, 831 F.2d 395 (2d Cir. 1987). The program does not just give loan recipients such as Frushour the major benefits of a taxpayer-funded education. As history has shown, a well-educated society is critical to our general welfare and prosperity.

■ It is thus understandable why Congress would "exact[ ] a quid pro quo" for government-guaranteed loans by using the undue hardship standard. *Id.* Debtors receive valuable benefits from congressionally authorized loans, but Congress in turn requires loan recipients to repay them in all but the most dire circumstances. *Pa. Higher Educ. Assistance Agency v. Faish*

(*In re Faish*), 72 F.3d 298, 306 (3d Cir. 1995) (debtor should not be able to discharge student loans "merely because repayment of the borrowed funds would require some major personal and financial sacrifices"). This heightened standard protects the integrity of the student-loan program and saves it "from fiscal doom." *Id.* at 302 (internal quotation marks omitted). It also ensures public support for the program by preventing debtors from easily discharging their debts at the expense of the taxpayers who made possible their educations. *See Hemar Ins. Corp. of Am. v. Cox* (*In re Cox*), 338 F.3d 1238, 1242 (11th Cir.2003).

Over the years, the circuit courts have considered the standards that should guide the undue hardship analysis. An overwhelming majority of circuits has now adopted the Second Circuit's three-part *Brunner* test. *See, e.g., Tirch*, 409 F.3d at 680; *Educ. Credit Mgmt. Corp. v. Polleys*, 356 F.3d 1302, 1309 (10th Cir.2004); *Gerhardt*, 348 F.3d at 91–92; *O'Hearn*, 339 F.3d at 564; *Cox*, 338 F.3d at 1241; *Brightful v. Pa. Higher Educ. Assistance Agency* (*In re Brightful*), 267 F.3d 324, 327 (3d Cir.2001); *Rifino*, 245 F.3d at 1087; *Brunner*, 831 F.2d at 396. *But see Long v. Educ. Credit Mgmt. Corp.* (*In re Long*), 322 F.3d 549, 554 (8th Cir.2003) (adopting totality-of-the-circumstances test).

This circuit has never explicitly adopted any one test in the Chapter 7 context, although we have applied the *Brunner* factors in the Chapter 13 context. *Ekenasi v. Educ. Res. Inst.* (*In re Ekenasi*), 325 F.3d 541, 546–49 (4th Cir.2003). We now adopt the *Brunner* test for Chapter 7. Since Congress did not provide express standards to guide the undue hardship analysis, the *Brunner* test best incorporates the congressional mandate to allow discharge of student loans only in limited circumstances. Uniformity among the circuits is also important in the bankruptcy context. In order to prove an undue hardship, therefore, a debtor must show:

> (1) that the debtor cannot maintain, based on current income and expenses, a "minimal" standard of living for herself and her dependents if forced to repay the loans; (2) that additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of the student loans; and (3) that the debtor has made good faith efforts to repay the loans.

■ *Brunner*, 831 F.2d at 396. The debtor has the burden of proving all three factors by a preponderance of the evidence. *O'Hearn*, 339 F.3d at 565; *Brightful*, 267 F.3d at 327.

## IV.

### A.

■ We do not decide whether Frushour has satisfied the first part of the *Brunner* test, because we hold that she has failed to prove the second and third factors. We do note, however, that ECMC is mistaken to suggest that having Internet and cable connections requires the conclusion that Frushour maintains more than "a 'minimal' standard of living." *Brunner*, 831 F.2d at 396. Such a per se rule would simply be too harsh. It cannot be said that the transmission of information, whether via Internet or cable, is always unnecessary to maintain a minimal standard of living, especially for those who work from home. The undue hardship test necessarily requires a case-by-case approach to determine whether certain expenses are or are not essential for maintaining a minimal standard of living. *See, e.g., Rifino*, 245 F.3d at 1088 (holding debtor satisfied first prong even though she had cable television). In short, the

mere fact of Frushour's Internet and cable expenses would not disqualify her from an undue hardship discharge.

### B.

Frushour has not, however, satisfied the second *Brunner* factor, "that additional circumstances exist indicating that [her] state of affairs is likely to persist for a significant portion of the repayment period of the student loans." *Brunner*, 831 F.2d at 396. This factor is the heart of the *Brunner* test. It most clearly reflects the congressional imperative that the debtor's hardship must be more than the normal hardship that accompanies any bankruptcy. *See Rifino*, 245 F.3d at 1087.

The second factor is, therefore, "a demanding requirement," *Brightful*, 267 F.3d at 328, and necessitates that a "certainty of hopelessness" exists that the debtor will not be able to repay the student loans, *id.* (internal quotation marks omitted); *see also Tirch*, 409 F.3d at 681 (same); *O'Hearn*, 339 F.3d at 564 (same). Only a debtor with rare circumstances will satisfy this factor. For example, although not exhaustive, a debtor might meet this test if she can show "illness, disability, a lack of useable job skills, or the existence of a large number of dependents." *Oyler v. Educ. Credit Mgmt. Corp. (In re Oyler)*, 397 F.3d 382, 386 (6th Cir.2005).

Frushour fails to meet this test because she has provided no additional circumstances beyond the debt itself that show her hardship is undue. She was in her forties at the time of the adversary proceeding, and has one child. There is no indication she or her son has any physical or mental disabilities, and both appear to be healthy. She is college educated, has a Florida real estate license, and has worked in several different areas of employment. Every indication is that Frushour is an intelligent individual with a range of job skills.

While Frushour's present financial condition is certainly not desirable, the second *Brunner* factor is prospective in nature and looks for exceptional circumstances beyond the debtor's current situation. *See Gerhardt*, 348 F.3d at 92 ("proving that the debtor is currently in financial straits is not enough.") (internal quotation marks omitted). Frushour's employment history illustrates that she has held good jobs in the past in which she made almost double her current income. She has provided no indication as to why she could not return to a similar type of work. Nor has she indicated any specific steps she has taken to seek higher-paying employment in other fields. Instead, she appears to be content with her present employment as a decorative painter because it was her original goal to work in the arts, the area in which she initially studied at Coastal Carolina. Having a low-paying job, however, does not in itself provide undue hardship, especially where the debtor is satisfied with the job, has not actively sought higher-paying employment, and has earned a larger income in previous jobs.

Indeed, Frushour points to no circuit court that has held a debtor can voluntarily take a low-paying job in her preferred field, and then refuse to repay her student loans by claiming undue hardship. Quite the opposite is true. As the Fifth Circuit has explained, "nothing in the Bankruptcy Code suggests that a debtor may choose to work only in the field in which he was trained, obtain a low-paying job, and then claim that it would be an undue hardship to repay his student loans." *Id.* at 93. This is the case because "it is not uncommon for individuals to take jobs not to their liking in order to pay off their student loans." *O'Hearn*, 339 F.3d at 566. For example, the Sixth Circuit

refused to discharge the debt of a married couple where one of the debtors chose to work in a low-paying job, as a pastor of a church. *Oyler,* 397 F.3d at 386. It found undue hardship was not present even though the debtors had three children and an annual income of $10,000 in the previous two years. *Id.* at 384.

Frushour nevertheless suggests that potential childcare costs would outweigh any additional income from working outside the home. But we have no way of knowing whether this would be the case. Her contention is founded on little more than speculation, and cannot satisfy her burden to prove the second *Brunner* factor by a preponderance of the evidence. *O'Hearn,* 339 F.3d at 565. And since this factor looks to the future, it is not implausible to think that childcare costs will drop as her child progresses in school. *See, e.g., Educ. Credit Mgmt. Corp. v. Carter,* 279 B.R. 872, 874, 878 (M.D.Ga.2002) (no undue hardship where, inter alia, plaintiff failed to show that her childcare costs were likely to remain the same in the future); *Wessels v. Educ. Credit Mgmt. Corp.,* 271 B.R. 313, 315 (W.D.Wis.2002) (same); *Kirchhofer v. Direct Loans (In re Kirchhofer),* 278 B.R. 162, 168 (Bankr.N.D.Ohio 2002) (same).

We recognize that Frushour's circumstances are far from ideal. But given her college education, real estate license, and restaurant management experience, we are not left with the likelihood that her present circumstances will extend for the rest of her repayment period or that she will not be able to pay off her loans at some future date. *See Brightful,* 267 F.3d at 328.

### C.

■ Frushour has also failed to meet the third *Brunner* factor, which requires her to show that she "has made good faith efforts to repay [her] loans." *Brunner,* 831 F.2d at 396. This factor looks to the debtor's "efforts to obtain employment, maximize income, and minimize expenses." *O'Hearn,* 339 F.3d at 564 (internal quotation marks omitted). Further, the debtor's hardship must be a result of factors over which she had no control. *Id.*

■ The debtor's effort to seek out loan consolidation options that make the debt less onerous is an important component of the good-faith inquiry. *See Alderete v. Educ. Credit Mgmt. Corp. (In re Alderete),* 412 F.3d 1200, 1206 (10th Cir. 2005). Although not always dispositive, it illustrates that the debtor takes her loan obligations seriously, and is doing her utmost to repay them despite her unfortunate circumstances. *See Tirch,* 409 F.3d at 682–83; *see also Smitley,* 347 F.3d at 121–22, 124 (relying in part on fact that debtor was eligible for income contingent repayment plan to deny discharge under "unconscionable" standard for Health Education Assistance Loans).

■ Frushour has not shown the requisite effort to repay her loans. To be sure, she should be commended for making several payments in the past. But she did not seriously consider the income contingent plan under the William D. Ford Direct Loan Program. *See Tirch,* 409 F.3d at 682–83 (debtor did not illustrate good faith when she did not take advantage of the William D. Ford Income Contingent Repayment plan); *see also Alderete,* 412 F.3d at 1206 & n. 1 (debtors did not prove good faith when they did not consider applying for the income contingent plan, even though the court was not certain they were even eligible for the plan). Both parties agree that Frushour could have taken advantage of this plan, and ECMC has provided assurances that

she continues to remain eligible. The plan would have allowed her to pay between zero and five dollars per month unless her income increased. After twenty-five years, any remaining debt would be discharged. *See* 34 C.F.R. § 685.209.

Frushour's only reasons for refusing that option, however, were that it was not suited for her and she wanted a fresh start. It is hard to see why these reasons are not simply shorthand for her lack of interest in repaying her debt. The consolidation plan would allow her both to remain at her preferred job and to maintain her current level of expenditures. Accounting for these considerations, Frushour has provided insufficient justifications for refusing to take a simple step that would have allowed her to fulfill her commitments in a manageable way. *See, e.g., Tirch*, 409 F.3d at 683. She has thus failed to satisfy the third *Brunner* factor of manifest good-faith effort to repay her loans.*

## V.

Frushour's case, like that of most debtors, is not without appealing and sympathetic elements. But Congress, in enacting § 523(a)(8), set a high bar for a debtor seeking to discharge government-guaranteed educational loans. Permitting loan beneficiaries a routine discharge of these obligations through bankruptcy would create the very inequities among loan recipients that Congress sought to avoid with its use of the word "undue."

To allow Frushour's claim would force courts to draw almost impossible lines. Applying a looser standard, courts would inevitably reach inconsistent results across bankruptcy cases. Some loan recipients would obtain discharge while others in similar circumstances would unfairly remain obligated. A looser standard would also be unfair to the vast majority of loan recipients who do not attempt to discharge

* With respect to the dissenting opinion of our fine colleague, we take exception to several points. The dissent's reliance on *Ekenasi* is ironic because *Ekenasi* supports the majority's view. The *Ekenasi* Court in fact reversed the bankruptcy court's determination that the debtor was due an undue hardship discharge. 325 F.3d at 549. It found that the bankruptcy court erred in holding that the debtor met the second *Brunner* factor because of the speculative nature of its determination. *Id.* at 548. Here also the bankruptcy court erred in speculating under the second *Brunner* factor that an individual with varied and demonstrated job skills would never achieve a higher income stream during the entirety of the loan repayment period. *Ekenasi* also concluded that the bankruptcy court mistakenly found that good faith was present. *Id.* at 549. The bankruptcy court in this case was similarly incorrect to find good faith because Frushour sought to discharge her student loans in their entirety without seriously considering an option that would have allowed her to pay between zero and five dollars a month. Thus, we fully agree with the *Ekenasi* Court that the conclusions the bankruptcy court sought to draw from the undisputed facts would be error under any standard.

It is disappointing that our dissenting colleague has never attempted to address the significance of the actual language chosen by Congress to govern the discharge of educational loans. The dissent does not choose to acknowledge that "[s]tudent loans, as a general rule, fall within the category of nondischargeable debts and pass through the bankruptcy process unaffected." *Ekenasi*, 325 F.3d at 545. It does not even contend its result would square with the large corpus of circuit law on this subject. Finally, the dissent disputes neither the availability of loan consolidation programs that would all but eliminate Frushour's current payments nor the existence of employment skills in restaurant management and real estate that may raise the earnings of this college educated individual over time. The danger of overlooking the many factors not addressed by the dissent is that student-loan discharges would become the rule and not the exception—the precise result that Congress in the explicit language of the statute has sought to avoid.

their loans and meet their obligations even with much self-sacrifice. Nor would we be faithful to Congress if we relaxed the undue hardship standard in a manner that drew increasingly on the public fisc to account for growing shortfalls.

The appellate courts have thus declined to allow debtors to discharge their student loans in cases where their circumstances at the time of the adversary proceeding were similar or even more compelling. *See, e.g., Alderete,* 412 F.3d at 1203, 1206 (no undue hardship on debt of $78,000 for debtors with three children and low-paying jobs); *Oyler,* 397 F.3d at 384, 386 (no undue hardship on debt of $40,000 for debtors with three children and $10,000 annual income over last two years); *Brightful,* 267 F.3d at 326, 329–31 (no undue hardship for debtor who had one dependent, even though she was forced to live with her sister, had no college degree, and was "emotionally unstable" with "glaring psychiatric problems"); *Brunner,* 46 B.R. at 756–58, *aff'd,* 831 F.2d 395 (2d Cir.1987) (no undue hardship where the debtor was unemployed and on public assistance, had made at most $9,000 per year over the previous several years, and had sent out "over a hundred" resumes in her chosen field, without success).

Frushour failed to show that she has exceptional circumstances, and she refused to consider loan consolidation programs that would have required from her a monthly payment of near zero based on her current income. She has thus failed to prove that she is in the limited class of debtors for which § 523(a)(8) meant to allow discharge. Accordingly, the judgment of the district court is

*REVERSED.*

HAMILTON, Senior Circuit Judge, concurring in part and dissenting in part:

I join Part II of the majority opinion which holds that we review *de novo* the determination of whether a debtor has met the undue hardship standard of 11 U.S.C. § 523(a)(8) (Bankruptcy Code 523(a)(8)) and review the factual underpinnings of that legal conclusion for clear error. However, I am compelled to dissent from the majority opinion's reversal of the district court's affirmance of the bankruptcy court's order discharging Sandra Jane Frushour's (Frushour) student loan debt pursuant to Bankruptcy Code § 523(a)(8).

After observing first-hand Frushour's demeanor and hearing her testimony, the bankruptcy court found that additional circumstances existed indicating that Frushour's dire state of financial affairs is likely to persist for a significant portion of the repayment period of her student loan debt (*Brunner's* second prong) and found that Frushour had made good faith efforts to repay her student loan debt (*Brunner's* third prong). *Brunner v. N.Y. State Higher Educ. Servs. Corp.,* 831 F.2d 395, 396 (2d Cir.1987) (setting forth three-prong test for proving entitlement to undue hardship discharge of student loan debt pursuant to Bankruptcy Code § 523(a)(8)). That the majority opinion rejects these findings as clearly erroneous (an act the majority unsuccessfully attempts to deny), on the record before us and the reasonable inferences to be drawn therefrom, is beyond all reason. Such rejection constitutes "an excellent example of the folly of courts in the role of philosopher kings." *American Acad. of Pediatrics v. Lungren,* 16 Cal.4th 307, 66 Cal.Rptr.2d 210, 940 P.2d 797, 890 (1997) (Brown, J., dissenting). The Supreme Court has repeatedly reiterated the extremely deferential nature of the clearly erroneous standard of review: " '[a] finding is "clearly erroneous" when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm

conviction that a mistake has been committed.' " *Anderson v. Bessemer City,* 470 U.S. 564, 573, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985) (quoting *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746 (1948)). Here, a thorough review of the entire record, stripped from any philosophical preconceived notions about the role of and strictures on government-aided education in our society, far from leaves one with a definite and firm conviction that the bankruptcy court's factual findings with respect to *Brunner's* second and third prongs are mistaken.

When the majority opinion is disrobed of its philosophic meanderings, that the majority opinion does nothing more than high handedly second guess the bankruptcy court's factual findings on two of the factual issues critical to Frushour's attempt to discharge her student loan debt pursuant to 11 U.S.C. § 523(a)(8) is patently obvious. In so doing, the majority opinion has quite blatantly ignored Bankruptcy Rule 8013, which provides that "due regard shall be given to the opportunity of the bankruptcy court to judge the credibility of the witnesses." Bankruptcy Rule 8013. *See also Dunning v. Simmons Airlines Inc.,* 62 F.3d 863, 868 (7th Cir.1995) ("We refuse to second-guess the court's credibility determinations because the judge has had the opportunity to observe the verbal and nonverbal behavior of the witnesses focusing on the subject's reactions and responses to the interrogatories, their facial expressions, attitudes, tone of voice, eye contact, posture and body movements, rather than looking at the cold pages [of a transcript].").

For these reasons and those that follow, I am constrained to dissent from the majority opinion's reversal of the district court's affirmance of the bankruptcy court's discharge of Frushour's student loan debt pursuant to Bankruptcy Code § 523(a)(8).

## I.

Quite remarkably, the majority misapplies the proper standard of review regarding the bankruptcy court's findings with respect to the *Brunner* prongs. The proper standard of review plainly requires us to review the bankruptcy court's findings with respect to the *Brunner* prongs for clear error. In applying the *Brunner* test in the Chapter 13 context in *Ekenasi v. Educ. Res. Inst.,* 325 F.3d 541, 546–49 (4th Cir.2003), we unequivocally treated the bankruptcy court's findings with respect to *Brunner's* three prongs as factual findings and held that at least two of those findings were clearly erroneous. *Id.* at 547 ("[W]e conclude that the bankruptcy court clearly erred in finding that [debtor] met his burden of establishing the *Brunner* factors and, therefore, erred in discharging the student loan obligations based upon the record before it."); *id.* at 548 ("Presented with this evidence, we are satisfied that the bankruptcy court clearly erred in finding that [debtor] had sufficiently proven that he would be unable, two years in the future, to maintain a minimal standard of living for himself and his dependents for a significant portion of the repayment period of the student loan."); *id.* at 549 ("We also conclude that [debtor] failed to prove that he 'has made good faith efforts to repay the loans,' *Brunner,* 831 F.2d at 396, and that the bankruptcy court clearly erred in finding otherwise.").

Common sense and simple logic support *Ekenasi's* treatment of the bankruptcy court's findings with respect to *Brunner's* three prongs as factual findings subject to the clearly erroneous standard of review. For example, the first *Brunner* prong, which asks whether the debtor can main-

tain, based upon current income and expenses, a minimal standard of living for herself and her dependents if forced to repay her student loan debt, necessarily asks the bankruptcy court to answer a factual question, albeit in the nature of a factual prediction of the future based upon current and reasonably foreseeable circumstances. Juries are routinely called upon to make similar factual predictions of the future based upon the evidence presented. For example, in a personal injury action involving a plaintiff who has suffered permanent injury and established liability, the jury is asked to predict the plaintiff's future medical expenses as an element of recoverable damages.

In sum, our role on appeal is to determine with respect to each *Brunner* prong, whether, although there is evidence to support the bankruptcy court's factual finding on that prong, we are left with a definite and firm conviction that the finding is wrong. *Anderson*, 470 U.S. at 573, 105 S.Ct. 1504. *Cf. Carolin Corp. v. Miller*, 886 F.2d 693, 702 (4th Cir.1989) (bankruptcy court's ultimate finding that Chapter 11 filing was not in good faith constitutes finding of fact subject to clearly erroneous standard of review). Indeed, the clearly erroneous standard required the district court as well as requires this court to give great deference to the bankruptcy court with respect to findings of fact. *In the Matter of Love*, 957 F.2d 1350, 1354 (7th Cir.1992). As the Seventh Circuit has succinctly stated: "Under the clearly erroneous standard, if the bankruptcy court's factual findings are plausible in light of the record viewed in its entirety, a reviewing court may not reverse even if it would have weighed the evidence differently." *Mungo v. Taylor*, 355 F.3d 969, 974 (7th Cir.2004).

Our review under the clearly erroneous standard is similar in nature to a sufficiency of the evidence inquiry, where we routinely give deference to the findings of the trier of fact even though we would reach a different result if we reviewed the evidence on our own in the first instance. *See, e.g., United States v. Burgos*, 94 F.3d 849, 862 (4th Cir.1996) ("A reviewing court, therefore, may not overturn a substantially supported verdict merely because it finds the verdict unpalatable or determines that another, reasonable verdict would be preferable. Rather, we shall reverse a verdict if the record demonstrates a lack of evidence from which a jury could find guilt beyond a reasonable doubt.").

Our *de novo* review comes into play to determine whether the bankruptcy court, having made the factual findings that it did with respect to the *Brunner* prongs, properly discharged or properly refused to discharge the debtor's student loan debt.

In footnote 1 of the majority opinion, the majority denies overturning any factual findings of the bankruptcy court as clearly erroneous and asserts that it has accepted every factual finding made by the bankruptcy court. (Majority Op. at 12–13 n. 1). From these premises, the majority goes on to conclude that Frushour failed to proffer sufficient evidence to support two of *Brunner's* three prongs.

While the majority expressly states that it accepts the bankruptcy court's factual findings, its actions speak much louder than its words. In fact, in a not-so-clever sleight of hand, the majority implicitly holds that two critical factual findings of the bankruptcy court are clearly erroneous. So why does the majority engage in this act of legerdemain. The answer: the majority's position simply does not hold water if any deference is paid to the bankruptcy court's factual findings. I will now proceed to analyze the *Brunner* prongs, giving the proper deference that is owed to the bankruptcy court's factual findings.

## II.

The first prong of *Brunner's* three prong test for proving entitlement to an undue hardship discharge of student loan debt, pursuant to Bankruptcy Code § 523(a)(8), asks whether the debtor can maintain, based on the debtor's current income and expenses, a minimal standard of living for herself and her dependents if forced to repay the student loan debt. *Brunner*, 831 F.2d at 396. Here, the bankruptcy court found that Frushour could not maintain even a minimal standard of living for herself and her small child if forced to repay her student loan debt. Although the majority opinion does not decide whether this finding is clearly erroneous, the issue is necessarily addressed in my dissent.

For the two calendar years preceding the trial in this case (2002 and 2003), Frushour and her young son lived below the poverty guideline for a two person household set by the United States Department of Health and Human Services. In 2002, Frushour's gross income was $7,738.00, while the applicable poverty guideline was $11,940.00. In 2003, Frushour's gross income was $11,589.00, while the applicable poverty guideline was $12,120.00. The record is also undisputed that at the time of the trial in this case (July 2004), Frushour's estimated gross income for calendar year 2004 was $11,976.00, still below the applicable poverty guideline of $12,490.00. As of March 14, 2004, Frushour owed Educational Credit Management Corporation (ECMC) $12,148.70 on her student loan debt.

Notably, ECMC does not deny or dispute that Frushour lived below the applicable poverty guideline for the two and one half years prior to trial. However, ECMC strenuously objects to Frushour availing herself of a § 523(a)(8) discharge on the basis, *inter alia,* that Frushour's current minimal lifestyle is voluntarily self-imposed, a rather absurd assumption that Frushour would "voluntarily" choose to live below the poverty guidelines. According to the logic of ECMC, the bankruptcy court's finding that Frushour could not maintain even a minimal standard of living for herself and her small child, if forced to repay her student loan debt, is clearly erroneous because Frushour voluntarily chose a career which is significantly lower paying than her previous career in the restaurant and tourism industry. ECMC's other main argument, in challenge of the bankruptcy court's Frushour-favorable finding with respect to *Brunner's* first prong, is that Frushour failed to prove that her expenses would increase commensurate with any increases in her income. Both of these arguments are without merit.

Necessarily implicit in the bankruptcy court's finding that Frushour could not maintain even a minimal standard of living for herself and her small child, if forced to repay her student loan debt, is its finding that Frushour was maximizing her income potential. At the evidentiary hearing in this case, in response to the question of whether she had received any recent job offers or knew of any opportunities where she could earn significantly more income while covering for additional childcare cost, Frushour testified that "[she] found that" even if she took a job that would give her more income or worked a second job, she would only break even because of the required childcare expense. (J.A. 14).

In its discussion of *Brunner's* second prong, the majority opinion dismisses any ability of the bankruptcy court to rely on this testimony based upon its opinion that such testimony is founded on little more than speculation. This farfetched opinion is simply belied by the record. This testimony, which on its face bespeaks of a basis

of personal knowledge, is supported by common sense and experience, upon which the bankruptcy court is entitled to rely as the finder of fact. *Bose Corp. v. Consumers Union of U.S., Inc.,* 466 U.S. 485, 501 n. 17, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984) (application of ordinary principles of logic and common experience are ordinarily entrusted to trier of fact); *Chapman & Cole v. Itel Container Int'l, Corp.,* 865 F.2d 676, 683 (5th Cir.1989) ("As the finder of fact, a judge must rely upon his or her experience and common sense."). First, very few persons would voluntarily choose to live below the poverty guideline, especially a loving mother with a young child. One cannot reasonably dispute that because Frushour is a single parent with absolutely no coparental support, her working a full-time or even a part-time job in the restaurant and tourism industry would require her to pay a third party to care for her young son during non-school hours. As it stands now, Frushour's current self-employed situation allows her the flexibility to care for her young son at no expense to her. In contrast, common sense and experience demonstrate that the restaurant and tourism industry routinely requires its employees to work nights and weekends, a time when childcare cost is at a premium.* In sum, the record here, as obviously augmented by the bankruptcy court's common sense and experience, abundantly supports the bankruptcy court's implicit finding that Frushour was maximizing her income potential and, thus, such finding is not clearly erroneous.

Having already established that the bankruptcy court's implicit finding that Frushour was maximizing her income potential is not clearly erroneous, ECMC's argument that Frushour failed to prove that her expenses would increase commensurate with any increases in her income disappears. The record is undisputed that Frushour's sole means of transportation is an exceptionally old (fourteen years) vehicle with extremely high mileage (250,000). The only reasonable inference from these facts is that, in the near future, Frushour will incur significant transportation expenses either in the form of substantial car repairs or the purchase of another vehicle. In either situation, she will almost certainly have to finance the cost over a number of years. The record is also undisputed that Frushour pays only $200 per month in rent. Common sense and experience also dictate that her housing expenses will only increase and perhaps significantly so given the extremely low amount of rent she currently pays. Moreover, according to her Schedule J, Frushour presently claims no medical expenses as part of her monthly living expenses. Given that Frushour has no health insurance and children being children, one can only reasonably expect that her medical expenses will increase during the foreseeable future. The very idea that Frushour's expenses would not increase commensurate with any increases in her income is patently absurd. Indeed, one should be definitely and firmly convinced that a mistake had been committed if the bankruptcy court had found that Frushour's expenses would not increase commensurate with any increases in her income.

In sum, there is simply no sound basis to hold that the bankruptcy court was clearly erroneous in finding that Frushour could not maintain even a minimal standard of living for herself and her small child, if forced to repay her student loan debt.

---

* While not a part of the record, my adult children tell me that it is not uncommon for babysitters to charge as much as $10 per hour while caring for a single child.

## III.

*Brunner's* second prong asks whether additional circumstances exist indicating that Frushour's current state of financial affairs is likely to persist for a significant portion of the repayment period. At trial, Frushour testified that the repayment period for the entire amount of her student loan debt, plus continuing interest, is approximately eight more years.

While "recogniz[ing] that Frushour's circumstances are far from ideal," (Majority Op. 11), the majority opinion implicitly holds that the bankruptcy court's finding in favor of Frushour with respect to *Brunner's* second prong is clearly erroneous because Frushour has provided no additional circumstances beyond the debt itself that show her hardship is undue. Indeed, implicit in this holding is the majority opinion's assertion that Frushour's hardship is but a "garden variety type."

Once again, the record belies this assertion. How much clearer does the record have to be to plainly show that Frushour's hardship far exceeds the garden variety type given the following facts: (1) Frushour and her young son have lived below the applicable poverty guideline for the two and one half years immediately preceding the trial in this case; (2) Frushour receives no child support from the child's father or help from her family; (3) the other jobs which Frushour is skilled to perform do not pay enough to offset the childcare expenses she would necessarily incur; (4) Frushour has no money budgeted for medical expenses; (5) she has no health insurance; and to top it all off, (6) Frushour's sole means of transportation is a fourteen year old car with a whopping 250,000 miles on it. Given that the hopelessness and dire nature of Frushour's situation screams off the pages of the record on appeal, how can we not accept the bankruptcy court's first-hand impression of the same?

Notably, in implicitly holding the bankruptcy court's finding with respect to *Brunner's* second prong is clearly erroneous, the majority opinion credits and largely relies upon ECMC's argument that a voluntarily underemployed debtor cannot take advantage of Bankruptcy Code § 523(a)(8). As already explained above, the record abundantly supports the bankruptcy court's implicit finding that Frushour has and is maximizing her income potential under the totality of the circumstances. Accordingly, the majority opinion's implicit clearly erroneous holding with respect to *Brunner's* second prong relies upon a fallacious basis.

In sum, given the largely undisputed factual circumstances of her financial condition and the very doubtful chances for improvement in the foreseeable future, the abstract legal conclusion drawn by the majority in implicitly holding that the bankruptcy court's finding with respect to *Brunner's* second prong is clearly erroneous is simply not sustainable, its philosophic meanderings notwithstanding.

## IV.

*Brunner's* third prong asks whether the debtor has made good faith attempts to repay her student loan debt. *Brunner*, 831 F.2d at 396. Here, after considering the documentary evidence and Frushour's testimony at trial, the bankruptcy court found that Frushour made good faith efforts to repay her student loan debt.

Because the record solidly supports this finding, the finding is not clearly erroneous. Frushour applied for and obtained forbearance of her student loan payments until August 1998. She then made twenty-three consistent payments of $113.41 or $189.00 until approximately June 2000. Subsequently, Frushour began to fall on

hard times, with her annual income dropping approximately $5,000 to $15,000 between the years 2000 and 2001. From then on she has lived below the applicable poverty guideline. Finally, there is no evidence in the record to suggest that Frushour took out her student loans with any intention of defaulting. These undisputed facts support the bankruptcy court's finding that Frushour made good faith attempts to repay her student loan debt.

The majority opinion conveniently overlooks this evidence of Frushour's good faith efforts at repayment; choosing to focus instead on Frushour's desire to emerge from bankruptcy with a completely fresh start, unencumbered by any obligations to repay her student loan debt under the income contingent repayment plan belatedly offered through the William D. Ford Direct Loan Consolidation Program. Indeed, this is the majority opinion's only rationale for implicitly holding the bankruptcy court's finding, regarding Frushour's good faith efforts at repayment, is clearly erroneous.

Review of the record plainly shows why the majority's implicit holding is not sustainable. First, the record contains no evidence to suggest that Frushour knew of the between zero and five dollars income contingent repayment option under the William D. Ford Direct Loan Consolidation Program prior to her seeking to discharge her student loan debt through the present adversary proceeding. Second, and more importantly, when the bankruptcy court specifically asked ECMC's attorney at the adversary proceeding whether she believed it (*i.e.*, the bankruptcy court) needed to look at undue hardship on Frushour in the context of the low monthly contingent repayment amount or whether she believed it should look at undue hardship on Frushour in the context of the total debt, counsel for ECMC emphatically

answered: "The total debt, Your Honor. That was just for purposes of options that are available." (J.A. 27). This answer by ECMC's counsel necessarily steered the bankruptcy court to consider the good faith inquiry in the context of Frushour's good faith efforts to repay her student loan debt as it was presently constituted, not upon the income contingent repayment plan.

To overturn the bankruptcy court's good faith finding on this record is simply beyond the purview of appellate review. Particularly outrageous is the majority opinion's total disregard of the bankruptcy court's first-hand opportunity to observe Frushour's demeanor and genuineness on the witness stand. This is a good faith inquiry! First hand impressions greatly matter! In sum, given Frushour's not insubstantial repayment history and the bankruptcy court's ability to make a first-hand assessment of her demeanor and genuineness in testifying about her student loan repayment history and dire financial condition, I would uphold the bankruptcy court's finding that Frushour has satisfied *Brunner's* third prong.

### V.

To summarize my dissenting views, *Brunner* called for the bankruptcy court to make findings of fact with respect to each of its three prongs. As the trier of fact, the bankruptcy court obviously made its findings with respect to these three prongs based upon reasonable inferences founded on common sense and experience from the direct and circumstantial evidence in the case. For the reasons above set forth, these findings are not clearly erroneous. The majority opinion's implicit holdings otherwise with respect to *Brunner's* second and third prongs plainly exceed the limits of our circumscribed standard of review in reviewing a bankruptcy court's

findings of fact for clear error. Accordingly, I would affirm the district court's affirmance of the bankruptcy court's order discharging Frushour's student loan debt pursuant to Bankruptcy Code § 523(a)(8).

If, as the majority posits, it has not found *any* of the bankruptcy court's findings of fact clearly erroneous, it is incredulous that the majority would find the bankruptcy court's legal conclusions drawn from those facts, as found by the bankruptcy court and affirmed by the district court, as insufficient to support an undue hardship discharge of Frushour's remaining student loan debt. When all the camouflage is stripped away from the majority's position, it is quite apparent that its philosophical scruples are offended over the thought that one should seek a discharge, under any circumstances, of a student loan debt. The majority simply finds it repugnant that anyone would seek discharge of his or her student loan debt, even under the most dire financial circumstances.

With all respect due the majority opinion, its reasoning is subtly fallacious in implicitly concluding that the bankruptcy judge was clearly erroneous in finding in favor of Frushour with respect to *Brunner's* second and third prongs. Should this irrational reasoning become pervasive, it would trump the reasonable interpretation of undue hardship and Bankruptcy Code § 523(a)(8) would become a nullity by judicial fiat.